# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DISTRICT OF COLUMBIA** | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No. |
| | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## COMPLAINT

The District of Columbia ("District"), through its chief legal officer, the Attorney General, brings this civil action against the United States of America, through its departments, agencies, and instrumentalities ("the Defendant U.S."), under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"), and the District of Columbia Brownfield Revitalization Act of 2000, as amended, D.C. Code §§ 8-631.01 *et seq.* ("Brownfield Act"). The District seeks costs, damages, and a declaration of future liability against the Defendant U.S. arising from the District's investigation and remediation of the contamination of the Anacostia River ("River"). The Defendant U.S. is jointly and severally liable to the District for these remedies because it owns and controls the Riverbed where hazardous substances are located, has owned and operated facilities that released and continue to release hazardous substances into the River, and generated, transported, and arranged for the storage or disposal of hazardous substances that released into the River.

The District states, claims, and alleges as follows:

1

## INTRODUCTION

1.      The River has been and must be a vital public resource—a resource for recreation, fishing, wildlife, and more. Yet, because of decades of pollution, generations of District residents have never known what it is like to use and enjoy a healthy River.

2.      From its confluence with the Potomac River all the way to present day Bladensburg, Maryland, the River was once pristine, crystal clear, and 40 feet deep. The River and its 176 square mile watershed were home to a wide variety of wildlife, including bald eagles, osprey, cranes, kingfishers, shad, herring, and eel. District residents enjoyed abundant fishing, boating and other recreational activities. Many residents along and east of the River relied on subsistence fishing as their principal source of protein.

3.      Beginning in the 1800s, the River became a dumping ground for sewage, trash and industrial waste.

4.      The Defendant U.S. bears substantial responsibility for the pollution of the River over the past 150 years. Indeed, it has been the biggest polluter. It has systematically contaminated the River through the indiscriminate dumping and release of hazardous substances and through destructive dredge and fill operations. These practices severely degraded the River's water quality and spoiled the River's sediment and shoreline.

5.      By using the River as a cost-free toxic dumping ground, the Defendant U.S. has inflicted catastrophic harm on the District and its residents, exposing them to dangerous chemicals and depriving them of the use and enjoyment of a once vital natural resource. The Defendant U.S.'s conduct has contributed to a decades-long "No Swimming" ban and continuous fishing advisories, devastated a once flourishing wildlife habitat, and turned much of the River into an eyesore.

6.    The Defendant U.S.'s reckless conduct has inflicted disproportionate harm on disadvantaged, predominantly Black communities who live near and have had a long relationship with the River.

7.    The Defendant U.S. owns and controls the Riverbed where hazardous substances are concentrated. In addition, the facilities and operations of the Defendant U.S. have been the single largest culprit of hazardous substance releases into the River. The Defendant U.S. released contaminants into the River from dredge and fill operations by the Army Corps of Engineers; the manufacture of guns and ordnance at the Washington Navy Yard; the dumping of military and other waste at the former Kenilworth Landfill; disposal operations at the former Naval Receiving Station at Poplar Point and Fort McNair; printing operations at the Bureau of Engraving and Printing; open burning at Langston Golf Course site; coal burning at the Capitol Power Plant; the storage of leaking electrical transformers at service areas; and other operations at federal buildings along the River and Washington Channel.

8.    Prior to 1973, when the District secured Home Rule, the Defendant U.S. also released hazardous substances into the River from the District's sewer system and waste disposal operations, which the Defendant U.S. then owned and controlled.

9.    Beginning in 2013, the District commenced the Anacostia River Sediment Project ("ARSP") to investigate and eliminate contamination in the River, restore damaged natural resources, and compensate the public for the harm wrought by the contamination ("ARSP investigation").

10.    The ARSP investigation confirmed the presence of hazardous substances in the River. These hazardous substances have posed and continue to pose a substantial risk to human health and the environment. They increase the risk of cancer, liver disease, diabetes, asthma, and

cardiovascular disease; harm fetal development; cause memory loss and learning disabilities; and reduce fertility. These hazardous substances also impair the survival, growth, and reproduction of aquatic wildlife.

11.    As a result of the ARSP investigation, the District will implement an extensive and expensive interim cleanup project scheduled to begin in 2025. The interim cleanup project will address the most significant contamination in the River. Additional cleanup, at additional cost, will likely be necessary after the interim cleanup is completed. In addition, an accounting for the past, present, and future damages that the Defendant U.S. and other parties liable for the contamination have caused to the District's natural resources, such as damages to compensate for the public's loss of the use of the River, must be made. Like future cleanup costs, these natural resource damages are not included in the costs of the interim cleanup project.

12.    On June 14, 2021, the District notified the Defendant U.S. and other liable parties of their responsibility to pay for the costs the District is incurring to clean up the River, known as "Response Costs," as well as their liability for natural resource damages. In September 2023, the District entered an historic settlement with one of those parties, the Potomac Electric Power Company, which agreed to pay the District's interim Response Costs, estimated at $47 million. The Defendant U.S., however, continues to refuse to take responsibility for its indisputable role as the biggest polluter of the River.

13.    The federal government must be held accountable for its unlawful conduct. Through this civil action, the District seeks to recover costs and damages from the Defendant U.S., and a declaration of future liability for releases of hazardous substances into the River.

## JURISDICTION

14.      This Court has subject matter jurisdiction over the Defendant U.S. pursuant to 42

U.S.C. §§ 9607, 9613 (CERCLA §§ 107 and 113), 28 U.S.C. § 1331 (a civil action arising under

the laws of the United States), and 28 U.S.C. § 2201 and 42 U.S.C. 9613(g)(2) (declaratory relief).

Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) and (g)(2).

15.      The Defendant U.S. has waived sovereign immunity under CERCLA. The

Defendant U.S. is subject to CERCLA in the same manner and to the same extent, both

procedurally and substantively, as any non-governmental entity. 42 U.S.C. § 9620(a)(l).

16.      The Defendant U.S. is also subject to State laws concerning removal and remedial

action, including State laws regarding enforcement at facilities owned or operated by a department,

agency, or instrumentality of the United States when such facilities are not included on the National

Priorities List set forth in 42 U.S.C.§ 9620(a)(4). None of the facilities identified herein are on the

National Priorities List, except for the Washington Navy Yard.

17.      The liability of the Defendant U.S. is preserved under other federal or state laws,

including common law, with respect to releases of hazardous substances or other pollutants or

contaminants.  42 U.S.C. § 9652(d).

## VENUE

18.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (c)(2), and (e)(1)(A),

and 42 U.S.C. § 9613(b).

## PARTIES

19.      Plaintiff, the District of Columbia, is a municipal corporation empowered to sue

and be sued. The District is represented by and through its chief legal officer, the elected,

independent Attorney General for the District of Columbia. The District is also a trustee over

public natural resources, including the River's water, fish, wildlife, and biota. *See* 42 U.S.C. § 9607(f)(1), (2)(b). The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81(a)(1). The Attorney General also has the authority to bring this action pursuant to CERCLA and the Brownfield Act. 42 U.S.C. § 9607(a)(1)-(4), (f)(1); D.C. Code § 8-634.07.

20.    The Defendant U.S. owns and controls the Riverbed where hazardous substances are located, owned and operated facilities that released and continue to release hazardous substances into the River, and generated and transported hazardous substances that it dumped or released into the River.

21.    As described in more detail below, the following agencies of the United States have been responsible for releasing hazardous substances into the River: the Architect of the Capitol, the Army Corps of Engineers, the Bureau of Engraving and Printing, the Department of the Army, the Department of the Interior, the Department of the Navy, the General Services Administration, the National Park Service, and the United States Park Police.

## STATEMENT OF FACTS

### I.    The Defendant U.S. Polluted the Anacostia River for Decades.

22.    As detailed below, the Defendant U.S. has contaminated the River and is responsible for Response Costs and natural resource damages to restore the River because it: (1) owns and controls the Riverbed where hazardous substances are located and from which hazardous substances have been and continue to be released; (2) owns or operates, or owned or operated, facilities that are releasing and/or released hazardous substances into the River; (3) generated, transported, deposited, or otherwise released hazardous substances from various locations directly

into the River or from locations along the River, which eventually migrated into the River; (4) arranged for the disposal of hazardous substances at various locations into the River or at locations along the River that migrated into the River; and (5) contributed to the hazardous substance contamination of the River by an act or omission that it had a reason to know would cause the contamination.

**A.    The Defendant U.S. Owns and Exerts Operational Control Over the Anacostia Riverbed.**

23.    The Defendant U.S. owns the Riverbed where hazardous substances have come to be located and from which hazardous substances have been and continue to be released.

24.    The Defendant U.S. operates on and exercises significant control over the Riverbed.

25.    Together with the National Park Service, the Army Corps of Engineers ("Army Corps") controls the River's navigational channel, including any activity or operation that impacts the channel.

26.    Demonstrating the Defendant U.S.'s control of the Riverbed, the Army Corps issues permits for dredge and fill operations in the River, and the National Park Service issues permits for any disturbance of the Riverbed, such as sampling of River sediment.

**B.    The U.S. Army Corps of Engineers Released Hazardous Substances Into the River Through Its Dredging Operations.**

27.    Since the 19th century, the Army Corps has performed dredging and filling operations within and along the River, from Bladensburg Marina in Maryland downstream to the confluence of the Anacostia and Potomac Rivers at the southern tip of the District. The Army Corps dredged the River on at least 26 occasions from 1938 to 2000, with more significant dredging for navigation every ten to twelve years.

7

28.     By dredging the River, the Army Corps created new land within and adjacent to the River and altered the course and entire ecosystem of the River. From 1902 until 1940, the Army Corps channelized the River, built sea walls, constructed Kingman Lake and Kingman and Heritage Islands, and filled in more than 1,000 acres of mudflats and wetlands with material dredged from the River.

29.     During these activities, the Army Corps spread and released hazardous substances throughout the River and along its shoreline.

30.     The Army Corps' internal documents describe how dredging and filling activities can cause releases of hazardous substances by resuspension and dispersion of contaminated sediment. The Army Corps also acknowledges that the "environmental integrity of much of the Anacostia River and its tributaries has been severely degraded by urbanization and [the Army Corps'] previous construction of Federal works to meet flood control and navigation needs."

31.     As one example of the Army Corps' contamination of the River through dredging and filling operations, in the late 1990s, the Army Corps dumped into Kingman Lake approximately 36,000 cubic yards of sediment dredged from a portion of the River extending from the CSX bridge to Benning Road. Notably, this occurred during a time when the River was under a fishing advisory because of hazardous substances in the River. Now, Kingman Lake requires remedial action because hazardous substances from the dredged sediment pose a significant threat to human health and the environment.

C.     **The Defendant U.S. Has Owned and Operated Facilities That Have Contaminated and Continue to Contaminate the River.**

32.     The Defendant U.S. owns and operates multiple landside facilities that have released and continue to release hazardous substances into the River. Some of the Defendant U.S.'s facilities housed operations that generated toxic contaminants that polluted the River. Other

facilities of the Defendant U.S. were themselves constructed with contaminated landfill material that has leeched into the water.

### 1. The Washington Navy Yard and the Southeast Federal Center.

33.    The Defendant U.S. has owned and operated the Washington Navy Yard ("Navy Yard") since its establishment in 1799. The Navy Yard is currently located on approximately 66.3 acres of land at 9th Street and M Street S.E. in the District.

34.    Prior to 1963, the Navy Yard also included about 60 acres directly to the west of its existing facility.

35.    The western part of the Navy Yard is now known as the Southeast Federal Center and, since 1963, has been under the control of the U.S. General Services Administration.

36.    The Navy Yard, including the Southeast Federal Center, is the nation's oldest continuously operated federal facility in the District. Its primary role evolved through several phases, from shipbuilding in the early 1800s, to ordnance production from the late 1800s through World War II, and finally for use as office and storage space in more recent years.

37.    Over the facility's operational life, the U.S. Navy's operations generated hazardous substances, many of which discharged into the River. These contaminating operations have included: ship repair; gun manufacturing; smelting and metal foundry casting; metal pressing; paint spraying at a paint shop; oil and chemical storage; electrical and steam power generation, including electric transformer operations; storage of scrap metal and coal; incineration; electroplating and polishing; photographic processing; laboratory operations; and laundry facility operations.

38.    Even after these operations ceased, hazardous substances generated at the Navy Yard continue to pollute the River through stormwater runoff and other land-to-water pathways.

39.    In 1988, the Environmental Protection Agency ("EPA") placed the Navy Yard on its National Priorities List due to soil and groundwater contamination on the site.

40.    In 1999, the U.S. Navy, EPA, and the District entered into a Federal Facilities Agreement under CERCLA to clean up the Navy Yard site. Separately, in 2014, pursuant to an Administrative Order issued by the EPA, the General Services Administration was required to investigate hazardous substance releases at the Southeast Federal Center.

41.    The Federal Facilities Agreement designated multiple areas at the Navy Yard for investigation and remediation. One is known as the Near-Shore Sediment operable unit, which includes the site's waterfront and extends into the River as far as the length of the facility's former piers—approximately 200 feet.

42.    The Federal Facilities Agreement documents the release at the Navy Yard of oil and petroleum, polychlorinated biphenyls ("PCBs"), dioxins, heavy metals and polycyclic aromatic hydrocarbons ("PAHs"), solvents, chemicals such as carbon tetrachloride, dichloroethane, perchloroethylene and vinyl chloride, and metals such as lead, chromium, cadmium, and antimony. Similar hazardous substance releases have been found in the subsurface at the Southeast Federal Center and in the River sediments in front of the Center.

43.    The U.S. Navy's prior industrial activities at the Navy Yard also released hazardous substances into the River through discharges to outfalls from its stormwater drain system. The U.S. Navy's investigation—performed since the Federal Facilities Agreement—indicates that the Navy Yard, including the Southeast Federal Center, is a source of PCB contamination to an outfall that discharges to the River. The U.S. Navy's investigation also reveals that drains connected to the River captured historical spills, wastewater, grit, and other by-products of industrial processes, in addition to stormwater runoff containing potentially contaminated eroded soils and debris from

parking areas. Additionally, the investigation found that stormwater outfalls from the Navy Yard are likely to have discharged contaminants, including PCB-contaminated solids, to the River. Similarly, sewer drainage and overland runoff from the Southeast Federal Center carried hazardous substances to the River. The darker-colored water in the picture below, taken from an aerial photograph in 1957, shows pollutants releasing from an outfall connected to the Navy Yard:



44.    Further evidence that the Navy Yard is a significant source of hazardous substance releases into the River, sampling results in near-shore sediments adjacent to the Navy Yard and the Southeast Federal Center show elevated concentrations of PCBs and PAHs.

45.    As the U.S. Navy has acknowledged, stormwater and cooling water discharges from the basement of Building 18 at the Navy Yard, a former power plant housing electrical transformers and other electrical equipment, are additional potential sources of PCB contamination to the River.

46.    The U.S. Navy also discharged into the River stormwater that was contaminated with hazardous substances from a coal storage area and coal ash sluice pit, which operated at the Navy Yard between 1940 and 1980. During a cleanout in 1997, samples of debris in this area contained extremely high concentrations of PCBs.

47.    The contamination from the Navy Yard and the Southeast Federal Center extends far beyond the facilities' shore and near-shore area. PCBs, PAHs, and other contaminants have migrated both upstream and downstream from the Navy Yard and Southeast Federal Center facilities due to tidal and other influences and because of the Army Corps of Engineers' dredge and fill operations.

### 2.    Kenilworth Landfill

48.    In or about 1942, the Army Corps and Department of the Interior selected an area now known as Kenilworth Park on the banks of the River to serve as a burning waste dump to address the need for landfill space within the District.

49.    At that time, a three-member Board of Commissioners appointed by the President governed the District. The District had no independent authority or budget to purchase or construct a landfill site either within or outside District limits.

50.    The Army Corps created most of the waste dump from contaminated dredged spoils from the River.

51.    The National Park Service directed the District how and where to build the dump, including the grade and elevation, and how to operate the dump. The National Park Service was intimately involved in the day-to-day operation of the dump, including approving wastes that could enter the dump. To this day, the Defendant U.S. still owns the land where the dump is located.

52.    The Kenilworth Landfill operated between 1942 and 1968. The Defendant U.S. was one of the largest generators of waste disposed at the Landfill, often using its own vehicles to transport waste to the Landfill. Some of that waste included spent refractory material from the Naval Gun Factory at the Navy Yard, partially burned computing equipment, and waste generated from 1,300 federal buildings throughout the District.

53.    The Kenilworth Landfill is currently undergoing a remedial investigation and a proposed remedial action under CERCLA. Hazardous substances found on the site include PCBs, PAHs, and metals such as arsenic and mercury.

54.    A 2008 Remedial Investigation of the Kenilworth Landfill found that hazardous substances released from the Landfill are migrating to the River via surface water runoff.

### 3.    Poplar Point

55.    Prior to 1882, Poplar Point consisted of little more than a grove of poplar trees, adjacent wetlands, and tidal marshes located in a delta of Stickfoot Creek, which drains into the River. The Army Corps filled and replaced Stickfoot Creek with the Stickfoot Branch sewer.

56.    Between 1882 and 1927, the Army Corps dredged sediment from the River near the Navy Yard and the Washington Gas East Station, a former coal gasification plant, and used the material to fill the tidal marshes adjacent to Poplar Point. Coal tar from the gasification plant has been found in the fill material bordering the River at Poplar Point.

56.     The Defendant U.S. has owned Poplar Point since the Army Corps created it, and several U.S. agencies have operated at Poplar Point, releasing hazardous substances to the River.

57.     The Defendant U.S. designated a parcel at Poplar Point for use by the U.S. Navy as the Naval Receiving Station, which operated from the 1940s through the 1960s. The Naval Receiving Station housed dry-cleaning facilities, weapons testing for the Naval Ordnance Laboratory, and several buildings for chemical, oil, and paint storage in underground and aboveground storage tanks.

58.     Currently, the former Naval Receiving Station parcel contains the National Park Service Headquarters for National Capital Parks-East, the U.S. Park Police Anacostia Operations Facility, an Aviation Hangar, various storage buildings, and open, undeveloped grassy areas.

59.     The U.S. Park Police has used the site for gasoline and chemical storage, jet propellant storage tanks, and motorcycle repair.

60.     On September 25, 2024, the District notified the National Park Service of ongoing PCB releases from the former Naval Receiving Station in an area where the Naval Receiving Station operated a heating plant and housed large electrical transformers.  There, the District found PCBs in soil that are actively entering an adjacent storm sewer system outfall

61.     The Defendant U.S. designated another parcel at Poplar Point for the Architect of the Capitol to operate the Botanic Garden Greenhouse and Nursery. The Architect of the Capitol operated the Greenhouse and Nursery between 1927 and 1993, releasing pesticides and other hazardous substances into the River.

62.     Surveys and sampling of environmental media at the Poplar Point Site have been conducted over the past couple of decades. These investigations found numerous hazardous substances, including PCBs and arsenic, PAHs, pesticides (4,4'-DDT, 4,4'-DDD, 4,4'-DDE, and

chlordane), and dioxins in the soil at the former Garden Greenhouse and Nursery and at the Naval Receiving Station. Groundwater at these areas contained toxic metals such as arsenic, barium, iron, manganese, nickel, thallium, vanadium, and zinc.

63.     From approximately 1942 until at least 1993, agencies of the Defendant U.S. operating at Poplar Point released hazardous substances into a ditch system that conveyed stormwater into Stickfoot Creek and then directly into the River. The existing storm sewer, groundwater seepage, and surface water runoff also previously transported and are likely actively transporting hazardous substances to the River. PCBs, PAHs, and chlordane have been found in River sediment directly offshore from Poplar Point.

### 4.    The Bureau of Engraving and Printing Complex

64.     The Bureau of Engraving and Printing is an agency of the U.S. Department of the Treasury. Since approximately 1914, the Bureau of Engraving and Printing has owned and operated its printing and associated operations in three buildings—the Main Building, the Annex Building, and the Freight Building, located at 14th and C Streets SW, Washington, D.C.

65.     The Bureau of Engraving and Printing's primary operations include printing (intaglio, offset, and letterpress), engraving, plating, trimming, packaging, storage, and shipment. Additional operations include ink manufacturing, wiping solution manufacturing, press roller reconditioning, equipment service, electric shops, paper shredding, waste collection, and disposal. These operations used hazardous substances, including PCBs, solvents, oils, metal plating solutions, inks, pigments, and other chemicals. The Bureau also formerly had twelve PCB-containing transformers and 42 large PCB-containing capacitors at the buildings.

66.    The Bureau of Engraving and Printing released these hazardous substances within their facilities. For example, extensive PCB contamination was found in the Bureau's transformer storage areas and adjacent areas in their Annex.

67.    Prior to 1938, when the District's wastewater treatment plant at Blue Plains was constructed, the Bureau of Engraving and Printing discharged wastewater directly into the Tidal Basin and Washington Channel. After 1938, the Bureau continued to release hazardous substances into internal drains. These drains emptied into the District's storm sewers, which in turn discharged into Washington Channel.

68.    The Bureau of Engraving and Printing's internal records indicate that operational wastes and chemical spills discharged to the storm sewer. Some of these releases contained PCBs. One report identified extensive PCB contamination in the transformer and adjacent areas on the site. The Bureau's annual reports to EPA reveal PCB transformer spills and PCBs in the floor drains that emptied into the storm sewer.

69.    The District has identified highly PCB-contaminated sediment in Washington Channel directly in front of the storm sewer outfall that drains from the Bureau of Engraving and Printing's site.

70.    In December 2023, the District's Department of Energy and Environment issued an Administrative Order against the Bureau of Engraving and Printing due to the Bureau's discharge of PCBs into the Washington Channel.

### 5.    Langston Golf Course

71.    The Langston Golf Course consists of two parcels connected by bridges across Kingman Lake. The west side extends from Benning Road to the National Arboretum, and along

the south and east side of the Arboretum to Kingman Lake. The east side sits on an island between Kingman Lake and the Anacostia River.

72.     In 1891, the site consisted predominantly of mud flats and marshes. The Army Corps dredged the mudflats and filled in this area of the River with landfill waste, creating the island that exists today.

73.     The National Park Service, an agency within the Department of the Interior of the Defendant U.S., has owned and operated on the island since it was created. The National Park Service directed the placement and oversaw the management of open burning and dumping of waste on the island beginning around 1930.

74.     The National Park Service also permitted the dumping of waste directly into Kingman Lake.  In 1937, the National Park Service directed the closure and covering of the landfill; this area is now occupied by a nine-hole golf course, which opened as Langston Golf Course in 1939. The National Park Service continued to manage and operate a dump with open burning on the west bank of the River until the early 1950s, when that land became part of the golf course.

75.     The National Park Service's operation of the dump caused severe contamination of the River through seepage and runoff of hazardous substances. Rainfall permeated clays under the site, causing hazardous substances from the dump to discharge to surface water, including Kingman Lake and Hickey Run at the north end of the golf course.

76.     The facility remains an ongoing source of contamination through surface and subsurface discharges of hazardous substances left behind from prior federal operations.

### 6. Fort McNair

77.     Fort McNair is a 108-acre facility operated by the Department of the Army adjacent to the mouth of the River. It occupies the peninsula separating the River from the Washington Channel. The Defendant U.S. established Fort McNair in 1794 as an arsenal, and the Fort has served multiple purposes throughout its operational years, including as an Army training facility, a federal penitentiary, and a general hospital.

78.     The Department of the Army identified nine contaminated areas within Fort McNair between 1984 and 1997. At least two of those areas have documented contamination from leaking underground storage tanks. The Physical Fitness Center site contained two 20,000-gallon underground storage tanks filled with oil. They were removed in 1987. Leaks from the storage tanks contaminated soil with hazardous substances, including lead and arsenic. The Department of the Army removed some of the contaminated soil from the Physical Fitness Center site during construction, but residual contamination remains.

79.     The Army and Air Force Exchange Service Station Remediation site at Fort McNair contained seven underground storage tanks. They were removed in 1991. After their removal, gasoline was observed in the base of the pits. A groundwater sampling at the site in 2011 detected naphthalene, a hazardous substance.

80.     The hazardous substance releases at Fort McNair entered the River via several pathways, including stormwater runoff, soil erosion, and groundwater leaching. Storm sewers adjacent to Fort McNair drain to the Washington Channel, which empties into the River near Hains Point. Sampling in the Washington Channel near the storm sewer outlets revealed hazardous substances in near-shore sediment.

### 7.    Capitol Power Plant

81.    The Defendant U.S. owns, and its agency the Architect of the Capitol operates, the Capitol Power Plant, a fossil-fuel-burning power plant located at 25 E Street, S.E. The Power Plant began operations in 1910, providing steam and electricity to the Capitol Building, primarily by burning coal. In 1952, the Power Plant ceased producing electricity but continued to use coal-fired boilers to generate steam and chilled water for the Capitol Complex. Beginning in 2007, the Power Plant began transitioning to natural gas as a fuel source.

82.    The Architect of the Capitol used several PCB-containing electrical transformers during operations at the Power Plant. The General Services Administration also used the Power Plant's outdoor coal yard from the mid-1980s to early 1991 to store drums of hazardous waste generated at other General Services Administration facilities.

83.    The operations of the Architect of the Capitol and the General Services Administration released hazardous substances, including PCBs and PAHs, at the Power Plant. Dye testing in 1999 confirmed that, during rain events, storm drains at the outdoor coal yard actively discharged hazardous substances associated with coal (PAHs) into the River. The hazardous substances entered the River through drains at the Power Plant that were inter-connected and discharged to the River primarily through the O Street Outfall. River sediment in front of the O Street Outfall is contaminated with hazardous substances, including PCBs and PAHs.

84.    Through its current connection to the combined sewer system, the Power Plant continues to release hazardous substances into the River through the Power Plant's cooling water intake pump house discharges, stormwater discharges, and other pathways.

###### 8. The General Services Administration Transformer Service Area

85.    From the mid-1970s to 1980, the General Services Administration operated a transformer service area at 10 P Street, SW, now a U-Haul facility.

86.    The General Services Administration performed maintenance on electric transformers and stored drums of PCBs and other waste at the facility. Employees of the General Services Administration complained about PCB exposure during maintenance activities, triggering the inspection of transformers at General Services Administration facilities throughout the National Capital Region.

87.    During a Congressional hearing, an employee of the General Services Administration testified under oath that dielectric fluids containing PCBs were routinely discharged into floor drains at the transformer service area until approximately 1977. These floor drains are connected to the storm sewer or combined sewer system, and both discharge to the River.

### D. The Federal Government Created and Controlled the District's Sewage System That Released Hazardous Substances to the River.

87.    The Defendant U.S. also contaminated the River through its historical control of District operations, including designing and constructing the District's combined sewer system, which sent raw sewage and hazardous substances directly into the River.

88.    In 1790, Congress created what is now known as the District of Columbia through its enactment of the Residence Act of 1790, 1 Stat. 130 (July 16, 1790). This Act declared that the District would be the seat of the Government of the United States, created through a donation from the states of Maryland and Virginia of ten square miles of land along the Potomac River between the Eastern Branch (now the Anacostia River) and Conococheague Creek (a northern tributary of the Potomac River).

89.    In 1871, Congress enacted a law that combined the city of Washington, Georgetown, and Washington County—which was also inside of the District—under one government headed by a governor appointed by the President.

90.    In 1874, Congress established a Presidentially appointed three-member Board of Commissioners to govern the District. The Board of Commissioners governed the District for nearly 100 years, until 1967, when Congress replaced the Commissioner system with a mayor and city council, still appointed by the President.

91.    In 1973, Congress passed the Home Rule Act, which gave residents of the District the right to elect the city council and mayor but reserved Congressional authority to approve or disapprove District legislation. This system of governance remains in existence today.

92.    During the 19th and most of the 20th centuries, the Defendant U.S. controlled most aspects of the District's affairs, including the location, operation, and closure of the Kenilworth and Langston Landfills, and the design and creation of the city's storm drain and sewage system.

93.    The District's sewer system dates to approximately 1810. During these early years, most sewage from the District discharged directly into the former Washington Canal that connects to the River near Hains Point.

94.    In 1871, prior to creating the Board of Commissioners, Congress created and appointed a D.C. Board of Public Works. From 1871 to 1874, the Board constructed about 80 miles of sewers, including the B Street and Tiber Creek sewers, which conveyed sewage from the Washington Canal to the marshes along the Anacostia and Potomac Rivers.

95.    For nine decades, Congress appointed an Army Corps Engineering Commissioner to a seat on the Board of Public Works for the District. The Army Corps Commissioner retained two deputies, one of whom managed the D.C. storm and sewage system.

96.     In the 1890s, after public debate, the Army Corps Commissioner declined to build a sewer system that separates sewage flow from stormwater flow. The Board of Public Works decided to keep and extend the then-existing combined sewer system, allowing stormwater to mix with sewage before discharge to the River. This created combined storm and sewer overflows, which dumped directly into the River and other water bodies. Currently, there are 14 active combined sewer outfalls along the River. Up until 2018, the combined sewer outfalls overflowed into the River approximately 84 times a year, dumping an average of 2.1 billion gallons of sewage directly into the River each year.

97.     Pollutants in sewage contain numerous hazardous substances, including PCBs, lead, mercury, and volatile organic compounds.

98.     Through rate increases from the District's water utility, District residents have funded projects to modernize the antiquated and poorly designed sewer system, including the Anacostia River Tunnel at a cost of $1.8 billion. In September 2023, D.C. Water completed the final segment of the tunnel, which will prevent 98% of sewer overflows into the River.

99.     The Defendant U.S., including the Army Corps, as controlling members of the District of Columbia Board of Commissioners, exercised ownership and control over the District's sewer system and, therefore, are liable for releasing hazardous substances into the River.

II.     **The District, at Enormous Cost, Has Begun Cleaning Up the River and Restoring the River's Natural Resources.**

100.     The Defendant U.S. and the District have long recognized the necessity of investigating and remediating the pollution in the River. Prior studies of the River concluded that the River suffered from persistent contamination and water quality degradation. Without governmental action, the River was likely to remain a hazard to District residents, particularly those who rely on it for recreation, commerce or subsistence.

101.    The District has begun the process of cleaning up the River and restoring its natural resources.

**A.    Remediating Contamination in the River**

102.    In 2013, pursuant to its authority under the Brownfield Act, the District's Department of Energy and Environment began a comprehensive investigation of hazardous substances in the nine-mile tidal portion of the River and its tributaries, beginning at the confluence of the Northwest and Northeast Branches of the River near Bladensburg, Maryland, and extending downstream to the confluence of the River and the Potomac River, including Kingman Lake and Washington Channel ("the River Project Site"). The objective of this investigation, known as the Anacostia River Sediment Project or ARSP, is to investigate the types, location and sources of contamination along the River Project Site. The River Project Site is outlined in red below:



103.    On December 31, 2019, as part of the ARSP, the District completed and published for public comment: (i) a Remedial Investigation Report, and (ii) a Feasibility Study Report, including a Focused Feasibility Study Report and a River-Wide Feasibility Study Report (collectively, "RI/FS"). The RI/FS details the nature and extent of the sediment contamination at the River Project Site, the risks posed to human health and the environment by contaminated sediments, and an evaluation of potential remedies to eliminate or mitigate those risks.

104.    The RI/FS concluded that certain chemical contaminants found in the River, namely PCBs, dioxin, and chlordane (a common pesticide banned from use), pose unacceptable risks to human health and the environment. The RI/FS also identified other chemicals, including PAHs (commonly found in petroleum and petroleum byproducts), arsenic, mercury, and other pesticides, as contaminants of concern because they, too, pose risks to human health and the environment, albeit less severe than the risks posed by PCBs, dioxin, and chlordane.

105.    Because PCBs pose the highest risk, the District selected PCBs as the remedy "driver," meaning that by focusing the remedy on eliminating or reducing the risks posed by PCBs, the selected remedy would also eliminate or reduce to acceptable levels the risk posed by other hazardous substances.

106.    On September 30, 2020, the District completed and published for public comment an Interim Record of Decision ("Interim ROD") for the River Project Site, which documents the District's decision to conduct early remedial action, a recognized remedial approach under CERCLA. The Interim ROD, among other things, establishes specific numerical cleanup goals for PCBs and identifies for early remedial action eleven (11) "Early Action Areas" or "hot spots" where PCB contamination is the highest. The Interim ROD is intended to eliminate or minimize

the risks posed by all other hazardous substances that are also located within the Early Action Areas.

107.    By removing or containing the most contaminated sediments, the District's implementation of the Interim ROD, expected to commence in 2025, will substantially reduce risk to human health and the environment while evaluations of the contamination of the entire River Project Site continue. To implement the Interim ROD, the District will use an adaptive management approach, which is intended to reduce the contamination in River sediment, track the results of the interim remedial action, and inform further actions by the Department of Energy and Environment that may be necessary to achieve the numeric cleanup goals established for the River Project Site. Achieving these cleanup goals may require implementing subsequent remedial actions or modifying a selected interim remedy at one or more locations. Either of these actions would result in significant additional cost to the District.

108.    To date, the District has incurred over $46 million dollars in investigative costs. The District anticipates spending much more to achieve the ARSP's remedial objectives.

**B.    Restoring the River's Natural Resources**

109.    CERCLA, the District's Brownfield Act, the National Oil and Hazardous Substances Contingency Plan, 43 C.F. R. §§300 *et seq*., the Federal Water Pollution Control Act, 33 U.S.C. §§1241 *et seq*., the Oil Pollution Act, 33 U.S.C. §§2701 *et seq*., the District's Department of the Environment Establishment Act, D.C. Code §8-151.08, and the District's Water Pollution Control Act, §8-103.03, authorize the Defendant U.S. and the District to act on behalf of the public as trustees to protect and preserve natural resources along the River. As trustees, the Defendant U.S. and the District may assess and recover damages for natural resource injuries resulting from the release of hazardous substances or oil into the River.

110.    In July 2021, the District, in concert with the U.S. Department of the Interior and the National Oceanic and Atmospheric Administration, in their joint capacity as trustees for the River watershed, began an assessment of natural resource damages at the River Project Site. Preliminary findings indicate widespread natural resource damages, including diminishment of wildlife habitat as well as economic loss to District residents who rely on the River for subsistence fishing. The trustees published a "Pre-Assessment Screen" documenting their determination that further efforts to investigate and assess damages to natural resources at the River Project Site are warranted.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

RECOVERY OF INCURRED RESPONSE COSTS AND NATURAL RESOURCE DAMAGES AND DECLARATORY JUDGMENT FOR FUTURE RESPONSE COSTS AND NATURAL RESOURCE DAMAGES UNDER CERCLA

111.    The District incorporates the allegations in all preceding paragraphs.

112.    The Defendant U.S. is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

113.    A person incurs liability under CERCLA when the person is: (i) an "owner or operator" of a "facility" that has released, caused to be released, or threatened to release hazardous substances; (ii) a "transporter" of hazardous substances that have been released to a "facility"; or (iii) an "arranger," or person who arranges for, the storage or disposal of hazardous substances that have been released to or at a "facility." 42 U.S.C. § 9607(a)(1)-(4).

114.    Under CERCLA, a "facility" is "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling

stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9).

115.    The Defendant U.S. is liable under CERCLA because it owns and operates, and owned and operated, numerous facilities that released, caused to be released, or threaten to release, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), hazardous substances into the River. As defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), these facilities include the Riverbed, the Washington Navy Yard and Southeast Federal Center, the Kenilworth Landfill, operations at Poplar Point, Fort McNair, the Bureau of Engraving and Printing complex, the Langston Golf Course site, the Capitol Power Plant, the General Service Administration's electric transformer service area, and the District's combined sewer system.

116.    The Defendant U.S. is also liable under CERCLA because it generated, transported and arranged for the storage or disposal of hazardous substances released to a facility, i.e., the River, including from the dredging and filling operations of the Army Corps of Engineers and the operation of the facilities identified in the preceding paragraph.

117.    By engaging in these activities that make it liable under CERCLA, the Defendant U.S. has harmed and will continue to harm the River.

118.    Because the Defendant U.S. has harmed and will continue to harm the River, the District has incurred and will continue to incur Response Costs—i.e., the costs the District is incurring to clean up the River.

119.    A person liable under Section 107(a)(4)(A) of CERCLA is liable for all response costs that a State incurs to clean up hazardous substances and that are not inconsistent with the National Contingency Plan. 42 U.S.C. § 9607(a)(4)(A).

120.    The definition of "State" specifically includes the District of Columbia under CERCLA, 42 U.S.C. § 9601(27), and the District's Response Costs are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

121.    Under Section 107(a)(4)(A) of CERCLA, the Defendant U.S. is liable for the District's Response Costs, including interest.

122.    Because the Defendant U.S. has harmed and will continue to harm the River, the District has suffered and will continue to suffer damages to its natural resources.

123.    A person liable under Section 107(a)(4)(A) of CERCLA, 42 U.S.C. § 9607(a)(4)(A), is also liable for "damages for injury to, destruction of, or loss of natural resources . . ."

124.    Under Section 107(a)(4)(A) of CERCLA, 42 U.S.C. § 9607(a), the Defendant U.S. is liable to the District for natural resource damages.

125.    Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), specifies that in any action for recovery of costs under Section 107 of CERCLA, 42 U.S.C. § 9607, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs . . . ."

126.    The District is entitled to entry of a declaratory judgment that the Defendant U.S. is liable to the District for Response Costs, including interest, as well as for natural resource damages.

127.    In the alternative, the Defendant U.S. is liable to the District under Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for contribution for all costs in excess of the fair and equitable share of Response Costs the District has incurred and will incur for the ARSP and natural resource damages.

**SECOND CAUSE OF ACTION**

RECOVERY OF INCURRED RESPONSE COSTS AND NATURAL RESOURCE
DAMAGES AND DECLARATORY JUDGMENT FOR FUTURE RESPONSE COSTS AND
NATURAL RESOURCE DAMAGES UNDER THE BROWNFIELD ACT

128.    The District incorporates the allegations in all preceding paragraphs.

129.    The Defendant U.S. is a person within the meaning of the Brownfield Act, D.C.
Code § 8-631.02(12).

130.    Under the Brownfield Act, a person incurs liability as a "responsible person" when,
with regard to a property from which there is a release of a hazardous substance, the person is: (i)
an "owner or operator" of the property; (ii) a "transporter" of hazardous substances that were
released at the property; (iii) an "arranger," or person who arranges for, the storage or disposal of
hazardous substances on the property; or (iv) a person who contributes to contamination by an act
or omission that they had reason to know would cause the contamination at the property. D.C.
Code § 8-632.01(c)(1)-(5).

131.    The Defendant U.S. is a responsible person under the Brownfield Act because it
owns and operates, and owned and operated, numerous properties that released, caused to be
released, or threaten to release, within the meaning of D.C. Code § 8-631.02(14), hazardous
substances into the River. These properties include the Riverbed, the Washington Navy Yard and
Southeast Federal Center, the Kenilworth Landfill, operations at Poplar Point, Fort McNair, the
Bureau of Engraving and Printing complex, the Langston Golf Course site, the Capitol Power
Plant, the General Service Administration's electric transformer service area, and the District's
combined sewer system.

132.    The Defendant U.S. is also a responsible person under the Brownfield Act because
it generated, transported, and arranged for the storage or disposal of hazardous substances released

to a property, i.e., the River, including from the dredging and filling operations of the Army Corps of Engineers and the operation of the facilities identified in the preceding paragraph.

133.    The Defendant U.S. is also a responsible person under the Brownfield Act because it contributed to the hazardous substance contamination of a property, i.e., the River, by an act or omission that it had reason to know would cause the contamination, including the dredging and filling operations of the Army Corps of Engineers and the operation of the facilities identified in Paragraph 131.

134.    By engaging in these activities that make it a responsible person, the Defendant U.S. has harmed and will continue to harm the River.

135.    Because the Defendant U.S. has harmed and will continue to harm the River, the District has incurred and will continue to incur Response Costs.

136.    These Response Costs are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300, as required by D.C. Code § 8-104.

137.    Because the Defendant U.S. has harmed and will continue to harm the River, the District has suffered and will continue to suffer damages to its natural resources.

138.    Under the Brownfield Act, D.C. Code § 8-632.01, the Defendant U.S., as a responsible person, is strictly, jointly, and severally liable to the District for Response Costs, including interest, and natural resource damages.

139.    D.C. Code § 8-634.07 provides the Attorney General for the District of Columbia the authority to request a declaration of future liability for Response Costs and natural resource damages.

140.    The District is entitled to entry of a declaratory judgment that the Defendant U.S. is liable to the District for Response Costs, including interest, as well as for natural resource damages.

141.    In the alternative, the Defendant U.S. is liable to the District for contribution under the Brownfield Act, D.C. Code § 8-634.09, for all costs in excess of the fair and equitable share of Response Costs the District has incurred and will incur for the ARSP and natural resource damages.

## PRAYER FOR RELIEF

WHEREFORE, the District prays that this Court:

a.    Enter judgment in favor of the District jointly and severally against the Defendant U.S., pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all Response Costs not inconsistent with the National Contingency Plan, plus interest, in an amount to be proven at trial.

b.    Enter judgment in favor of the District jointly and severally against the Defendant U.S., pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all natural resource damages related to the ARSP, plus interest, in an amount to be proven at trial.

c.    Enter judgment in favor of the District jointly and severally against the Defendant U.S., pursuant to the Brownfield Act, D.C. Code § 8-632.01(b), for all Response Costs not inconsistent with the National Contingency Plan, plus interest, in an amount to be proven at trial.

d.    Enter judgment in favor of the District jointly and severally against the Defendant U.S., pursuant to the Brownfield Act, D.C. Code § 8-632.01(b), for all natural resource damages or related to the ARSP, plus interest, in an amount to be proven at trial.

e.     Enter declaratory judgment of liability in favor of the District jointly and severally against the Defendant U.S. for all future Response Costs and natural resource damages pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2).

f.     Enter declaratory judgment of liability in favor of the District jointly and severally against the Defendant U.S. for future Response Costs and natural resource damages pursuant to the Brownfield Act, D.C. Code § 8-634.07.

g.     Alternatively, in the event the District is liable for any Response Costs or natural resource damages arising from the contamination of the River, enter judgment in favor of the District jointly and severally against the Defendant U.S. for all Response Costs and natural resource damages in excess of the District's fair and equitable share.

h.     Enter judgment in favor of the District and jointly and severally against the Defendant U.S. for the costs and attorneys' fees it incurs litigating this action.

i.     Order such other and further relief as the Court deems just and equitable.

Dated:  January 10, 2025

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

BETH MELLEN
WILLIAM STEPHENS
Assistant Deputy Attorneys General
Public Advocacy Division

LAURA BECKERMAN
Acting Chief, Housing and Environmental Justice Section

/s/ *Wesley Rosenfeld*
WESLEY ROSENFELD [#1002428]
SEAN POWERS [#198053]*
ALEC BOWMAN [#90019707]*
Assistant Attorneys General

*/s/ David S. Hoffmann*
DAVID S. HOFFMANN [#983129]
BRIAN CALDWELL [#979680]*
Senior Assistant Attorneys General
Office of the Attorney General for the District of Columbia
400 Sixth St., NW
Washington, D.C. 20001
(202) 368-2569
Wesley.rosenfeld1@dc.gov
David.hoffmann@dc.gov

**Attorneys for the District of Columbia**

\* application/certification for admission to Court forthcoming or pending